UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
HERMAN LEBOWITZ, EKATERINA REZNIKOV,
and KEITH BLACK,

                     Plaintiffs,

        -against-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION, JOHN O'MAHONEY, and LAURA IZZO
(individually and in their official capacities),

                     Defendants
------------------------------------------------------------------------X

Docket No.: 15-CV-02890
(LDH)(ST)

**THIRD AMENDED
COMPLAINT**

**Jury Trial Demanded**

**Hall, J.
Tiscione, M.**

      Plaintiffs, HERMAN LEBOWITZ, EKATERINA REZNIKOV, and KEITH BLACK, by

and through their attorneys, STAGG, TERENZI, CONFUSIONE & WABNIK, LLP,

complaining of Defendants herein, alleges, upon knowledge as to themselves and their own

actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

      1.     This action is brought pursuant to the Age Discrimination in Employment Act of

1967, the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., Title VII of the Civil

Rights Acts of 1964, The New York State and City Human Rights Laws, New York common

law, and any other causes of action which can be inferred from the facts set forth herein.

      2.     The jurisdiction of this Court is invoked under 28 U.S.C. § 1331, federal question

jurisdiction, and 28 U.S.C. § 1343, based on the aforementioned federal statutes.

      3.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28

U.S.C. § 1367 because the state claims are so related to the federal claims that they form a part of

the same case or controversy between Plaintiff and Defendants.

4.      Venue is proper pursuant to 28 U.S.C. § 1391.

5.      All conditions precedent to maintaining this action have been fulfilled.  A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") on or about June 25, 2014, November 7, 2014 and on December 2, 2014, for Herman Lebowitz, Ekaterina Reznikov and Keith Black, respectively.  In or around June 2014, a Notice of Claim was filed on behalf of each Plaintiff. A notice of a right to sue letter was issued to Herman Lebowitz on February 19, 2015, to Keith Black on July 1, 2015, and to Ekaterina Reznikov on November 6, 2015.  This action was commenced within ninety (90) days of Herman Lebowitz's, Keith Black's, and Ekaterina Reznikov's receipt of said notice.

## PARTIES

6.      At all times hereinafter mentioned, Plaintiff Herman Lebowitz ("Lebowitz") was and still is a resident of Kings County, New York.

7.      At all times hereinafter mentioned, Plaintiff Ekaterina Reznikov ("Reznikov"), was and still is a resident of Kings County, New York.

8.      At all times hereinafter mentioned, Plaintiff Keith Black ("Black"), was and still is a resident of Kings County, New York.

9.      Defendant, New York City Department of Education ("DOE"), was and still is a New York City government entity, located at 52 Chambers Street, New York, NY 10007.

10.      Defendant, John O'Mahoney ("O'Mahoney"), is the principal at Sheepshead Bay High School ("Sheepshead Bay"), located at 3000 Avenue X, Brooklyn, New York 11235. O'Mahoney was and/or is responsible in participating in the hiring, firing, promotion and discipline of employees and other employment related issues.  Additionally, O'Mahoney is

charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. O'Mahoney has the power to make personnel decisions regarding Plaintiffs' employment.

11.     Defendant, Laura Izzo ("Izzo"), is the assistant principal of special education at Sheepshead Bay and was Reznikov's direct supervisor.   Izzo was and/or is responsible in participating in the hiring, firing, promotion and discipline of employees and other employment related issues. Additionally, Izzo is charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices.   Izzo has the power to make personnel decisions regarding Plaintiffs' employment.

## FACTS

*Herman Lebowitz*

12.     Lebowitz is a fifty-eight (58) year old male, born on August 24, 1957.

13.     Lebowitz began his employment with the DOE in September 1990 as a mathematics teacher. Lebowitz has been employed as a mathematics teacher at Sheepshead Bay since September 2000.

14.     In or around January 2012, O'Mahoney became the Principal of Sheepshead Bay. Prior to becoming Principal, O'Mahoney admitted to two conflict of interest charges relating to his wife's position with the DOE and was fined $4,000. As principal, O'Mahoney became Lebowitz's supervisor.   Up to that point, Lebowitz had an exemplary record of performance within the DOE, always received satisfactory yearly reviews, and was never the subject of any discipline.

15.    From the outset of O'Mahoney's supervision of Lebowitz, and continuing through present date, O'Mahoney and his underlings, including Izzo, have engaged in a pattern of discrimination, harassment, and retaliation against Lebowitz due to his age.

16.    When O'Mahoney took over at principal, during a staff meeting, he told the staff that the school was over budget by millions of dollars.  It is well known that the senior teachers earn a greater salary than the younger teachers, and that ridding the school of senior teachers if a mechanism often used to cut the budget.  O'Mahoney often asked the older teachers, including Lebowitz, when they are going to retire, or threatened to discharge a teacher if he or she did not retire.

17.    A few months later, Mahoney attempted to do just that.  In or about May 2012, in an attempt to rid the school of older teachers, he made every teacher reapply for their jobs at Sheepshead Bay.  He then hired back the vast majority of younger teachers, if not all of the younger teachers, and of all of the teachers he refused to hire back, the vast majority, if not all of them, were over 40 years old.  Although Mr. Lebowitz recently received a satisfactory rating from O'Mahoney, he was one of the older teachers who was not rehired.

18.    The union filed a grievance on behalf of the teachers who were not rehired, arguing that O'Mahoney's action of not rehiring the older teachers violated the collective bargaining agreement's seniority provision.  In or about June 2012, the arbitrator ruled in the union's favor, and Lebowitz was reinstated to his position as a teacher.  Because O'Mahoney had to abide by the seniority provision and would have to discharge the younger teachers first, he decided not to discharge any teachers.  Those decisions demonstrated that O'Mahoney's purpose for requiring the teachers to reapply for their jobs was to get rid of the older teachers.

19.     The action by O'Mahoney in forcing all teachers to reapply and not rehiring the older teachers set the tone for his discrimination and harassment of the older teachers.  The older teachers, including Lebowitz, knew that O'Mahoney would be targeting them.

20.     For instance, O'Mahoney made it known he wanted all of the math teachers in the school—who were all over 40 years old—to get a "U" rating regardless of their performance.

21.     In another example, O'Mahoney referred to the last years of a teacher's career as the "fuck you years," and "fuck you money."  He made those comments directly to Lebowitz on at least two occasions.  He expressed his disdain for the teachers who were toward the latter part of their careers.

22.     The following school year, in or around October 2013, the assistant principal of Special Education, Izzo, who, upon information and belief, is related to O'Mahoney, conducted an observation of Lebowitz's class.  Izzo, despite no background in math, gave Lebowitz a poor evaluation without any basis in fact. Similarly situated teachers who were under the age of forty (40) or who did not complain about discrimination, did not receive poor evaluations without a factual basis.

23.     In or around December 2013, Izzo went on maternity leave. Before leaving, during a staff meeting, Izzo stated that she would "take care of" the younger teachers.  For instance, all the young teachers had keys to Izzo's room which had a Xerox machine and other supplies. No senior teacher had access or keys to enter her room.  Izzo created an atmosphere pinning the young teachers against the older teachers.  This resulted in the younger teachers and older teachers sitting on opposition sides of the room.  During this meeting, one of the younger teachers, Francis Tuthill, pointed at the older teachers and said, "you guys are going to get it," meaning wrath from the administration.  The younger teachers also had an ongoing joke they

made about Lebowitz in which one said, "I have great news" and the other, posing as Lebowitz replied, "I still have a job."

24.     On or about March 7, 2014, O'Mahoney observed Lebowitz and gave him a poor evaluation, rating his performance as ineffective in a number of areas.  However, during the time that O'Mahoney observed Lebowitz, Lebowitz was not teaching a class, but was rather proctoring a test given by the lead teacher.  Although Lebowitz followed the department's orders exactly as directed, he received a poor evaluation.  Lebowitz was caught in a Catch 22—either receive a poor evaluation for proctoring the test as directed, or be charged with insubordination for not following the directions of the department head.

25.     On or about March 10, 2014, O'Mahoney inspected Lebowitz's classroom and asked to view Lebowitz's "word wall," which O'Mahoney criticized him for not having during his March 7 evaluation.  Lebowitz showed him the wall, along with proof that the wall was up during the March 7 evaluation.  O'Mahoney further criticized Lebowitz for having out of date student work on the walls.  However, in making that assessment, O'Mahoney incorrectly stated that it was March 20, rather than March 10, and thus the student work was not out of date.  When Lebowitz brought these issues to O'Mahoney's attention, O'Mahoney still refused to change the ineffective ratings he gave to Lebowitz, despite being made aware that they were based upon incorrect information. Similarly situated teachers who were under the age of forty (40) or who did not complain about discrimination, did not receive poor evaluations based upon false or incorrect information.

26.     On or about May 2, 2014, Izzo again observed Lebowitz during first period. O'Mahoney and Izzo consistently and regularly evaluated teachers over the age of forty (40) during first period. This is done because the whistle to call the students up from breakfast is often

late, causing students to be late for the class period. Teachers are then held responsible and penalized for the student lateness in their evaluations. Teachers who were under the age of forty (40) and who did not complain of discrimination were not routinely observed during first period, were not penalized or held responsible for late students or even entirely absent classes. Many of the younger teachers were actually granted observation "do-overs" in Ms. Izzo's words, in which they could be observed again and not have the first observation count. That benefit was not afforded to Lebowitz or his similarly situated coworkers who were over the age of forty.

27.    Since O'Mahoney became Principal, O'Mahoney and Izzo gave younger teachers advanced notice before O'Mahoney and/or Izzo conducted an informal observation. Informal observations are supposed to be unannounced visits. Older teachers, including Lebowitz, were not similarly advised by O'Mahoney or Izzo in advance as to when informal observations would be conducted.

28.    Moreover, as Principal at Sheepshead Bay, O'Mahoney targeted older teachers by discharging them, subjecting them to unfounded discipline, baseless ratings, and harassment, and strong-arming them into retirement, while consistently replacing them with younger teachers. Teachers who were the target of O'Mahoney's harassment and discriminatory animus included, but not limited to, Black, Reznikov, Steve Cohen, Barry Martin, Jean Laventure, Susan Crichlow, Elina Lozovskaya, Nataliya Shifrina, Kathleen Morgenlander, Joseph Klass, Robert Fasano, Florence Egbuchulam, and Lois Rosenblatt.

29.    While Lebowitz had a stellar record of performance prior to O'Mahoney's arrival, after O'Mahoney became principal, he began to issue negative observations and evaluations of Lebowitz's performance, while not similarly treating Lebowitz's younger co-workers, or those who did not complain of discrimination.

30.     On or about May 13, 2014, Izzo conducted a formal observation of Lebowitz. Izzo arrived at the classroom five minutes late and failed to observe Lebowitz instructing the children during their "Do Now" assignment, a key component to the class for evaluation purposes. Although Izzo missed the "Do Now" portion of the lesson, she falsely stated in her observation report that the "Do Now" portion of the lesson comprised the entire lesson and rated him ineffective under the student assessment category.  Izzo also missed the vocabulary review portion of the class and yet gave him poor reviews for that portion of the evaluation as well.

31.     On or about May 21, 2014, Lebowitz applied for a posted vacancy in integrated co-teaching ("ICT"), a class taught by both a regular education math teacher and a special education teacher. Lebowitz was informed that he was granted the position and on or about June 24, 2014, he was given his program for the upcoming school year, indicating the new position.

32.     On or about September 2, 2014, Lebowitz discovered that his program had changed and that Dr. Lisa Clark ("Clark") was now tasked to do ICT.  Lebowitz approached O'Mahoney and Izzo and requested that he be returned to the ICT position, but Mahoney refused even though, as per the collective bargaining agreement, the teacher with the most seniority is entitled to the position (and Lebowitz had the most seniority).  Lebowitz filed a grievance against O'Mahoney and won that grievance, which allowed him to proceed with the ICT position.

33.     When a teacher receives a rating of developing or ineffective, they are given a Teacher Improvement Plan ("TIP").  At the start of the 2014-2015 school year, Mahoney sent an e-mail listing all of the teachers who received TIPs, and only the older and more senior teachers were on the list.   That meant that only the older and more senior teachers received developing or ineffective ratings and that no younger or new teachers received such ratings. Lebowitz was on

the list, as he was given a developing rating for the 2013-2014 school year because of Defendants' animus against older teachers.

34. The ratings received by teachers, and whether they are in the TIP program are supposed to be confidential. However, by listing who received TIPs in the e-mail, O'Mahoney publicized to the entire staff who received developing or ineffective ratings. This was humiliating and embarrassing to Lebowitz (and the other older teachers), an experienced teacher who had a distinguished career as a teacher. It also resulted in ridicule from the younger teachers.

35. On or about September 12, 2014, Lebowitz applied for the position of cafeteria supervisor. Under the union rules, the most senior teachers should be given preference for the position. Additionally, the posted position was meant for one teacher. However, O'Mahoney broke up the position into two positions, giving Lebowitz period five and giving another teacher with less seniority period six. Lebowitz filed a grievance on October 10, 2014 and won. Despite O'Mahoney's efforts, Lebowitz became the cafeteria supervisor for periods five and six.

36. On or about September 15, 2014, Lebowitz met with O'Mahoney to discuss his TIP. During this meeting, O'Mahoney told Lebowitz that he is a bad teacher and that his students' Regents scores were terrible in algebra. Lebowitz reminded O'Mahoney that his students' scores were in fact great. O'Mahoney looked up Lebowitz's students' scores and appeared upset when he realized that he was misinformed about Lebowitz's and his students' performance.

37. On or about October 7, 2014, O'Mahoney and Izzo came into Lebowitz's second period class and where principal O'Mahoney began looking through his papers on his podium without permission. Izzo then asked Lebowitz to meet with her and O'Mahoney in the

principal's office during seventh period. During this meeting, O'Mahoney yelled at Lebowitz for not incorporating "learning targets" in the lesson O'Mahoney observed. However, O'Mahoney first discussed the concept of "learning targets" in an e-mail sent to the teachers after his observation of Lebowitz. Given that Lebowitz could not have incorporated O'Mahoney's instructions on learning targets in the observed lesson because the e-mail was sent after that lesson, O'Mahoney's conduct during this meeting was another effort by him to harass, retaliate, and set Lebowitz up to fail.

38.     On or about October 14, 2014, O'Mahoney came to Lebowitz's second period class with Izzo and checked a student's work. Later that day, O'Mahoney asked to meet with Lebowitz. During this meeting, O'Mahoney ridiculed Lebowitz and told him that he is not a good teacher. He also criticized Lebowitz for a student's failure to respond to O'Mahoney's questions during the lesson, despite the fact that the student did not speak English.

39.     On or about October 28, 2014, Izzo conducted an informal observation of Lebowitz.  During Lebowitz's post observation meeting with Izzo on or about November 6, 2014, Izzo told him that his lesson was good.  She then told Lebowitz that O'Mahoney was going to review his rating and make the final decision on the rating even though he did not observe Lebowitz during this lesson. On or about November 10, 2014, Lebowitz received the observation report of the October 28, 2014 lesson, in which he received two ineffective and two developing ratings.  The report indicated that it was last revised on November 10, 2014, the day Lebowitz received it.  Upon information and belief, O'Mahoney changed Lebowitz's ratings, giving him two ineffective and two developing ratings. Upon information and belief, Izzo told two other older teachers, Kathy Morganlander and Keith Black, that O'Mahoney would make the final decision on their evaluation reports, regardless of his presence at the observation.

40.     In or around November 2014, during a staff meeting, O'Mahoney was referring to the older teachers and stated that "these are the fuck you years.  This is the fuck you money." O'Mahoney continued to make these comments in subsequent meetings.  On one occasion, Lebowitz asked O'Mahoney what he meant by his comments.  O'Mahoney responded and stated, "it's almost impossible to get rid of any senior teachers, the union won't allow that, and to get rid of a senior teacher will take years."

41.     In or around the beginning of March 2015, O'Mahoney informed Lebowitz that he would be teaching an additional geometry class during first period, while he already had a class that period.  This required Lebowitz to teach two different types of geometry during the same class period. Moreover, this additional class resulted in Lebowitz having four math classes, teaching four different math subjects, which is against the collective bargaining agreement. Izzo informed Lebowitz that he would start teaching the additional geometry class on March 15, 2015 and that the additional class would be for only one week. However, Lebowitz was required to teach this class until the end of the school year.

42.     On or about March 24, 2015, Lebowitz had a post observation meeting with Izzo. Izzo had rated Lebowitz effective in every category and the meeting was positive up until O'Mahoney walked in.   Izzo stated that Lebowitz's use of assessment in instruction was effective and O'Mahoney gave her a glaring look which prompted Izzo to change her mind and give Lebowitz a developing rating for that category.

43.     On or about April 30, 2015, during Izzo's post observation conference with Lebowitz, Izzo informed Lebowitz that she was going to give him lower ratings to make sure his final rating was sufficiently low.  Izzo further stated that O'Mahoney was planning on giving Lebowitz a poor rating in the next observation.

44. About two weeks later, O'Mahoney observed Lebowitz, and as Izzo promised, O'Mahoney gave Lebowitz seven ineffective ratings. The ineffective ratings were baseless. During the post observation conference, O'Mahoney told Lebowitz, "It feels like you don't want to be here. Leave."

45. As Izzo warned, Lebowitz received an overall rating of "developing" for the 2014-2015 school year.

46. As a result of the developing rating and TIP, Lebowitz was required to have two training meetings per month with administration. The administration repeatedly failed to conduct these trainings, and in fact failed to even appear at more than half of them.

47. At the start of the 2015-2016 school year, O'Mahoney directed Lebowitz to teach common core algebra in his algebra 2/trigonometry class. On January 13, 2016, O'Mahoney's observation of Lebowitz was interrupted by a fire drill, allowing him only seven minutes to observe. O'Mahoney criticized Lebowitz for teaching common core algebra in this the algebra 2/trigonometry class, even though O'Mahoney had directed him to do so.

48. On or about January 21, 2016, O'Mahoney conducted an observation of Lebowitz. During a post observation meeting, O'Mahoney rated Lebowitz ineffective in every category except one where he rated him as developing. During the post-observation conference, O'Mahoney told Lebowitz that the students were incapable of understanding the algebra 2/trigonometry material, and that he should teach them common core algebra. This is another example of O'Mahoney setting Lebowitz up for failure.

49. Due to the baseless negative ratings that Lebowitz received during the previous two school years, he was prevented from applying to additional positions within the Department of Education, such as after school jobs, tutoring, or college teaching. Additionally, as

Sheepshead Bay is closing at the end of the 2015-2016 school year, Lebowitz's ability to find another job will be impeded by his negative overall ratings and will result in him remaining on Absent Teacher Reserve ("ATR").

50.     From the foregoing, Lebowitz alleges that Defendants have discriminated against him based on his age and retaliated against him in violation of the Age Discrimination in Employment Act, the New York State Human Rights Law, and the New York City Administrative Code, and has suffered emotional, physical and financial damages.

*Ekaterina Reznikov*

51.     Reznikov is a fifty six (56) year old Russian female, born on September 14, 1959.

52.     In or around 1997, Reznikov entered the American school system as a teacher and in or around 1999 was hired by the DOE at Sheepshead Bay as a math teacher.

53.     While at Sheepshead Bay, Reznikov received glowing reviews from her principals and due to her effectiveness as a teacher resulted in her students receiving high passage rates on the Regents Exams and placement tests.

54.     O'Mahoney was hired as the new principal of Sheepshead in January 2012. Izzo was hired as an assistant principal at Sheepshead in May 2012. Izzo became Reznikov's direct supervisor during the 2012-2013 school year.

55.     At the start of her tenure at Sheepshead, Izzo demonstrated a pattern and practice of prejudice and animosity towards teachers over forty years old. Izzo was younger and talked with younger teachers about their social lives, sex lives, and generally excluded teachers over the age of forty from their conversations.

56.     In or around October 2012, Izzo told the younger teachers that they would keep their jobs because by the time the school shut down no older teachers would be left. In or around

November 2012, when teachers over forty years old attempted to join the conversation between Izzo and the younger teachers, or direct the conversation back to professional matters, Izzo often responded by stating, "This conversation is not for oldies!" On another occasion, Izzo told Reznikov in front of several others, "this conversation is for young people."

57.    On several occasions, when Izzo observed Reznikov entering the bathroom, Izzo stated, "They get $100,000 per year to go to the bathroom."

58.    In or around November 2012, Reznikov received an unsatisfactory on her evaluation. This was the first unsatisfactory rating she had ever received in her career. In that same month, co-worker, Steve Cohen, a fellow senior teacher who was afraid of losing his job due to his older status, told Reznikov, "please stay away from me, I am afraid to be associated with you."

59.    At the beginning of 2013-2014 school year, Izzo became the head of the math department. She took over the only room in the math department with a copy machine. Izzo refused to give the teachers over forty years old keys to the room, while the young teachers were allowed to make a copy of the keys so that they could use the copy machine and have access to all the necessary teaching supplies.

60.    In or around October 2013, Reznikov took four days off to seek treatment for a condition that was suspected to be cancer. Teachers are allotted ten (10) sick days each year. Reznikov had ninety (90) sick days stored up. O'Mahoney sent Reznikov a nasty email stating that she better have left a lesson plan for the substitute teacher.  When Reznikov asked Izzo why O'Mahoney would write such an email, Izzo responded "we don't want senior teachers here with your stale methods. I just don't want any senior teachers in this department and this school, period."

14

61.     On November 4, 2013, Izzo came to observe Reznikov's class. Izzo told Reznikov to meet her the next day an hour before her first class (7:40 a.m.) to discuss the evaluation. On November 5, 2013, Reznikov arrived at Izzo's office to find the door closed. She heard Izzo in her office with some of the younger teachers. Reznikov knocked on the door and one of young teachers opened the door and then slammed the door in Reznikov's face. Izzo refused to admit Reznikov.

62.     On November 13, 2013, Ms. Cooper asked Reznikov and the rest of the older teachers for $25.00 to pay for a party for Izzo. All the young teachers were invited to attend the party while the teachers over forty years old were not. While the administration is prohibited from receiving presents or money from teachers and vice versa, Reznikov was pressed to contribute funds for Izzo's party.

63.     On November 14, 2013, Reznikov received a letter from Izzo asking her to report to her office with her union representative. Izzo informed Reznikov that she was going to get a disciplinary letter for taking the four sick days in October to seek medical treatment. When Reznikov asked why, Izzo stated that O'Mahoney instructed her to issue the discipline. Reznikov began to cry. Izzo stated that she would not put a disciplinary letter into her file. However, when Reznikov looked at her file in June 2014, the disciplinary letter was there.

64.     Izzo went on maternity leave in December 2013. As a result, O'Mahoney became Reznikov's direct supervisor. Before leaving, the young teachers expressed concern about having O'Mahoney observing them instead of Izzo. Izzo responded "they have to worry", pointing to the teachers over forty.

65.     On February 25, 2014, Reznikov received an evaluation from an observation that occurred in November 2013. Teachers are supposed to receive an evaluation within ninety (90)

days after the observation and a post observation conference is supposed to take place soon after the observation.  No post observation conference took place following this observation.  One of the main critiques in the evaluation was that Reznikov did not utilize her computer or smart board. However, Reznikov was assigned to  a room with no working computers or smart board. Reznikov had made several requests to have them fixed to no avail.

66.     Later that day, a few of the younger teachers, Rebecca Mayfield and Anne Brewka, approached Reznikov in the bathroom and told her that she does such good job, that her students are doing well, and that they wanted to learn from her and observe one of her classes. When those younger teachers asked Izzo to observe Reznikov, Izzo told them that they could not learn from Reznikov and that she was not a good teacher.  Reznikov later learned from those younger teachers that Izzo had told them that in order to keep their tenure, they need to be mean to the senior staff.

67.     On February 26, 2014, O'Mahoney and seven (7) other school administrators walked into Reznikov's class unannounced and started asking the students questions like, "do you understand what she is talking about?", "do you understand her?", "does her accent seem unpleasant to you?" Reznikov barely finished her lesson as she felt intimidated and offended by the administration's harassment.

68.     Izzo regularly disrespected Reznikov in front of her students.  When Reznikov said, "Hello" or "Good Morning" to Izzo, Izzo ignored her or make the comment, "Here she is again."

69.     On March 3, 2014, O'Mahoney held a meeting before first period that went seven (7) minutes into the class time. All the teachers over forty were nervous about arriving to their first class late, while the young teachers were relaxed, telling Reznikov that "it's your

16

responsibility" to arrive to their classes on time. O'Mahoney did not dismiss the teachers until 8:47 a.m., seven minutes after the start of first period. When Reznikov left the meeting, O'Mahoney said to her, "I don't understand why you're not standing outside of your room when students are arriving," an impossibility because O'Mahoney did not dismiss her until 8:47 a.m..

70.     On March 4, 2014, Reznikov had a post observation meeting with O'Mahoney. O'Mahoney leaned over the desk and said "you are the worst teacher in this school. I want you to leave this school and leave this profession. You are a disgrace." Reznikov responded that all her students are passing her tests and the City tests and that she did not understand his comments. O'Mahoney started yelling at her and said "do not talk when I am talking, you listen to me when I am talking!" Reznikov felt scared and bullied to the point that she could barely walk. Her colleague, Lebowitz, had to help her walk upstairs to her classroom.

71.     On March 5, 2014, Reznikov received an "ineffective" observation from O'Mahoney. Every example he gave in his evaluation was contrary to the grading rubric. For example, part of the teaching guidelines at the school is that when a student does not know the answer to a question, the teacher should not tell the student the answer, but should try to help her reach her own answer. Reznikov exhibited this technique during her observation and O'Mahoney stated in his evaluation that because Reznikov did not give the student the answer, she does not know math.

72.     Later that day, Reznikov wrote O'Mahoney a letter stating that all her lesson plans had previously been approved and that she wanted to know what an effective teacher looked like. O'Mahoney refused to provide her anything, but suggested to her in a letter that she and he would observe Clark's master lesson. Clark was a teacher tenured in math the prior year but is a teacher in business studies. O'Mahoney did not join Reznikov in observing Clark's class

and the class was not effective as students were not paying attention, Clark only gave the students two simple problems to work on and Clark was not able to solve them herself.

73. On March 13, 2014, during a weekly meeting, Assistant Principal Mario Ford ("Ford") was discussing ELL students (students whose second language is English). Ford stated, "we can improve the kids, but we can't improve the teachers, although we don't want them, there is nothing we can do about it." It was clear to Reznikov that Mr. Ford was referring to her because of her accent. Reznikov felt very threatened by this remark. Reznikov's students had never complained about her accent, or showed signs that they could not understand her.

74. On March 20, 2014, O'Mahoney held a meeting in the library with all the teachers. O'Mahoney stated, "I have been asked what a highly effective teacher looks like." He then proceeded to give details of what makes a highly effective teacher, and everything he said Reznikov does herself during her lessons.

75. In or around April 2014, Izzo returned from maternity leave. On April 24, 2014, during a faculty meeting, Izzo informed the teachers that the State was planning to conduct observations. Izzo further discussed the observations to the young teachers and told them the exact period the State would be observing them. Thereafter, Izzo said to the teachers over forty, "you need to be prepared all the time."

76. The State observations took place from April 29 to May 1, 2014. The days prior, Izzo told Clark to keep the teachers over forty busy so they could not prepare for the observations, while the young teachers were permitted to stay in their classrooms and prepare for the observations.

77. On April 30, 2014, the State observed Reznikov's classroom. The observation took place while many of her senior students were on a school sanctioned trip. Thus, there were

only seven (7) students in her class. Izzo told Reznikov, "Now we got you. You can't argue with the State observation. Students just don't come to your classes," ignoring the fact that many of her students were on the school sanctioned trip. A similarly situated younger teacher, Mr. Vidal ("Vidal"), also had his class observed during the school sanctioned trip. He said to Reznikov, "if Izzo tries to use this against me, I am going to side with the seniors (referring to the senior teachers)." Izzo approached Vidal and told him he had nothing to worry about, and that the observation would not be used against him. Izzo did not give Reznikov similar reassurance.

78.     Izzo also observed Reznikov during the State observations. The school administration had informed the teachers that they would not be observed during the State observations. Reznikov asked Izzo why she observed her while the State was conducting its observations, and Izzo said, "I did that because I want all the senior teachers out of here."

79.     On May 1, 2014, Reznikov had a biopsy procedure scheduled and she had to leave work forty (40) minutes early. Reznikov told Izzo that she would not be able to come to a scheduled meeting. Izzo responded, "these meetings are important, please schedule to be sick in the summer. You remind me of my mother, she had cancer, but she never died." Later that day, Izzo said to Reznikov, "it is your responsibility to find out what happened at the meeting, I am not going to repeat myself." Reznikov arrived to her classroom with a red face, as she had been crying, after Izzo's harassment. O'Mahoney walked by her classroom while she was in the middle of her lesson and said, "I see Reznikov has a red face, this is a good time to observe her."

80.     On May 2, 2014, Reznikov arrived early to school to meet with a few of her students for tutoring purposes. Izzo walked by her classroom and said to Reznikov, "here you are with the kids again; if you were a good teacher you would not have to tutor." Reznikov responded, "you are killing me physically, I do not deserve this treatment." Izzo then said, "you

remind me of my mother. I hate her and I hate you." Later in the day, Reznikov made a formal request to meet with Izzo concerning her treatment towards her. Izzo agreed, but then never showed up to the scheduled meeting.

81.     On May 8, 2014, Izzo told Reznikov that she was going to give her a post observation conference discussing how terrible of a teacher she is. Ironically, Reznikov's students had all just passed their placement exams. When Reznikov went to Izzo's office for the post observation conference, Izzo said "what are you doing? You are not supposed to be here!" At a department meeting later in the day, in front of the faculty, Izzo yelled at Reznikov "why won't you get it through your head! There will be no post [observation conference]! I will write a letter and put it in your mailbox and that's it! Got it?" From then on, Izzo refused to give Reznikov a post observation conference and she was the only teacher not granted the required conference following her observations.

82.     On May 22, 2014, Izzo and a few of the younger teachers walked by Reznikov. Izzo said, "by the way, I don't like the way you carry yourself so unprofessionally," without basis in fact.

83.     On May 23, 2014, during a faculty meeting, Izzo accused Reznikov of allowing her students to walk in the hallway without a pass. Reznikov denied the accusation and asked to speak to her outside the meeting. While outside, Izzo said to Reznikov, "I will still rate you as an ineffective teacher, you need to leave the system." Reznikov responded, "I need my medical benefits for my cancer." Izzo said, "oh, die already!"

84.     On May 29, 2014, there was a faculty meeting near O'Mahoney's office. Reznikov saw the Regents exam preparation books. She asked Izzo when the teachers would be getting the books. Izzo responded, "you are not going to get them. When all the senior teachers

are gone next year, Ms. Castillo will get the books." Reznikov never received the books nor did her students.

85.     On June 9, 2014, Izzo told Reznikov to come to her office at 9:50 am. When Reznikov arrived, Izzo refused to open the door as she was socializing with some of the younger teachers. By the time Izzo opened the door, Reznikov had a class to teach. Izzo said to Reznikov that they did not have time to talk, as if it was Reznikov's fault. Izzo stated that she was going to rate Reznikov on what she saw without the benefit of a post observation conference. Thereafter, Izzo rated Reznikov ineffective, without any basis.

86.     On June 17, 2014, during one of the Regents exam proctoring days, Reznikov arrived an hour early before her shift to talk to Maura Wynn ("Wynn"), the exam coordinator, about leaving early on June 20 for a medical procedure to determine if she had cancer. Reznikov suggested she would arrive an hour earlier. Wynn refused Reznikov's request without any explanation. Then Wynn herself was out of school for two and a half days.

87.     Reznikov worked on June 17 from 10:00 to 12:40 in the library and then from 12:40 to 4:15 administering a test. She was not permitted to use the bathroom. After she submitted the test materials in the library, she went to use the bathroom. Ford watched Reznikov walk towards the bathroom. When she returned to the library, Ford said, "Reznikov, where have you been all day? I was looking for you the whole day. Where were you right now?" Reznikov responded, "you saw me walking into the bathroom." Ford said that her behavior is "punishable" and that she was going to hear about it. Black, a colleague of hers, was there during this conversation.

88.     Later that day, Angel, a young science teacher who was in charge of collecting the Regents exam materials, told Black and Reznikov to relieve Mr. Vidal and Mr. Pressour, both

21

young teachers, of their duties in order for them to take a break. The latter teachers had started working the same time as Black and Reznikov. Izzo walked by Reznikov and Reznikov said, "someone will come to relieve me, right?" Izzo responded, "I don't think so, you're going to stay here until 6." Reznikov said, "what if I need lunch or a bathroom break?" Izzo responded, "I don't believe you need any of those things."

89.     On June 18, 2014, when Reznikov brought her Regents exam materials back to the library, the young teacher in charge of collecting the materials kept looking for faults. He asked Reznikov about signatures, purposefully questioning her abilities and intelligence. Reznikov said, "what are you trying to do?" He answered, "I am doing what I was told." Izzo walked over and said to Reznikov "you're going to get a letter, why are you giving him a hard time? Why are you talking to me disrespectfully?" Reznikov responded, "I'm not, I brought back the papers, what is the problem?" Then Izzo said, "you have to take lunch for forty two minutes, I'll be watching you. There are always problems with you, all you senior teachers." Reznikov felt so bullied that she could not walk home, as she usually did. She had to call her husband to pick her up. She also suffered from lower abdominal pain because she was not given bathroom breaks. She went to the doctor that night and the doctor told her that she must take bathroom breaks in order to alleviate the pain.

90.     On June 20, 2014, Reznikov arrived to the library at 8 am. Izzo told her "glue your behind to the chair to answer the phones." Reznikov responded, "Until when? I need to go to the hospital for a procedure." Izzo said, "I'll allow you to leave at 1:40 pm, but you have to be at the phone at all times." During the day, Reznikov had to use the bathroom. She asked another teacher to relieve her so she could take a bathroom break. The teacher refused. He said, "Izzo is outside. I don't want to get in trouble."

91.     Reznikov suffered abdominal pain and was shaking to the point that the doctors could not perform her procedure later that day.

92.     On June 23, 2014 through June 24, 2014, Reznikov and a few of the math teachers were sent out to grade Regents exams at New Utrecht High School.  Reznikov did a remarkable job and the administration at New Utrecht wrote her a nice letter complimenting her.

93.     On June 26, 2014, Reznikov's last day at Sheepshead Bay, she received a letter inviting her and her union representative to Izzo's office.  When Reznikov arrived, Izzo told her that she was getting a disciplinary letter because she had taken an hour for lunch instead of forty-two minutes.  Reznikov stated that Izzo's accusation was untrue.  Izzo said, "fact or no fact, you are going to be rated ineffective, you are going to lose your license."  Reznikov responded, "you just don't want me to be alive."  Izzo responded, "exactly."

94.     Later that day, Reznikov asked one of the secretaries to make a copy of her file. When she got the copies, she realized that all the commendation letters were taken out of her file.

95.     Reznikov received an ineffective overall rating for the 2013/2014 school and was placed on ATR.  Reznikov was placed at Franklin Delano Roosevelt High School for the 2014/2015 school year and received an overall rating of highly effective.

96.     In or around June 2015, Reznikov was placed back on ATR.

97.     Based on the foregoing, Reznikov alleges that Defendants discriminated against her based on age, disability, and national origin in violation of the ADEA, the ADA, Title VII, and the New York State and City Human Rights Laws, and has suffered emotional, physical, and financial damages.

*Keith Black*

98.     Black is a forty-seven (47) year old male, born on August 5, 1968.

99.    Black began his employment with Defendant, the DOE, in September 1998 as a mathematics teacher at Newtown High School.  Black has been employed as a mathematics teacher at Sheepshead Bay since September 1999.

100.    In or around January 2012, O'Mahoney became the principal of Sheepshead Bay, and as such, became Black's supervisor.  Up to this point, Black had an exemplary record of performance within the DOE, receiving all satisfactory yearly reviews, and was never the subject of any discipline.

101.    After O'Mahoney became principal, at a faculty meeting, he reported to the teachers that the school was over budget by millions of dollars.  Everyone knew that to cut the budget he was going to target the older teachers.

102.    Black heard O'Mahoney state at least two times that for the senior teachers, these are the "fuck you years" and that the salaries they receive are "fuck you" money.

103.    In or around early 2012, Black requested Family Medical Leave Act (FMLA) leave to care of his mother who was very ill.  Defendants approved Black's request for the period February 13, 2012 through June 30, 2012.

104.    In May 2012, as a ploy to get rid of the senior teachers, O'Mahoney forced every teacher to reapply for their teaching positions.  O'Mahoney failed to hire back most of the senior teachers and re-hired the vast majority of younger teachers.

105.    O'Mahoney's actions resulted in the union filing a grievance, arguing, among other things, that failing to hire back so many senior teachers violated the collective bargaining agreement which gives the more experienced teachers seniority.  The union won the grievance and O'Mahoney was forced to rehire those senior teachers he tried to lay off.  When O'Mahoney

was directed that he could not discharge the older teachers, he hired all of the teachers back and did not discharge any of the younger teachers.

106.   O'Mahoney made it clear from his words and actions that he wanted to get rid of all of the older and senior teachers, and favored the younger teachers.

107.   One ploy O'Mahoney used to attack the older teachers was to fraudulently administer the student's Measures of Student Learning ("MOSL") tests, so the older teachers could not use objective evidence--the student test scores--to contradict the subjective observation reports.  In evaluating teachers, there is a hybrid system based on student test scores (objective evidence) and observations by the administration (subjective evidence).   To measure the students' learning by administering the City-wide MOSL tests, the students are supposed to be given that City-wide test at the beginning of the year to obtain a baseline score, and then a test at the end of the year to determine their progress.  To prevent those test scores from helping the teachers, O'Mahoney directed that the teachers to give a sample MOSL test to the students, teach the test to the students, and then provide them with the same test a few days later, in an attempt to establish an artificially inflated baseline score.  That conduct is not only fraudulent, but defeats the entire purpose of obtaining an accurate baseline.  By artificially inflating the student's baseline MOSL scores, the teachers were less likely to be able to rely on the student test scores obtained at the end of the year—an objective form of evidence—to show the student's progress, and thus the teacher's competency.  With the teacher's only opportunity to have objective evidence to support their rating taken away, the administration gained almost complete control over the evaluation process by using the subjective observation reports to get rid of the older teachers (and did so by using the students as pawns).  As such, Defendants gave the older

teachers negative observation reports and the younger teachers positive observation reports to achieve their ultimate goal of ridding the school of the older teachers.

108.    Black began the 2012-13 school year back in Sheepshead Bay after returning from his FMLA leave.  In or around late November 2012, Black scheduled an observation with his Academy Leader, Maura Wynn ("Wynn") for December 5, 2012. Thereafter, on or about November 30, 2012, Wynn and O'Mahoney made an unannounced visit (referred to as a snapshot) to one of Black's classrooms.

109.    After the November 30, 2012 snap shot, Black met with O'Mahoney and Wynn for a post observation conference. O'Mahoney gave Black suggestions and advised Wynn to write up the snap shot.  These snaps shots were not to be counted toward the teacher's yearly rating.  Prior to November 30, 2012, Black received two other snap shot observations, which were satisfactory.

110.    On December 5, 2012, Wynn conducted a formal observation and gave Black a satisfactory rating. Later, Wynn also gave Black the report from the November 30, 2012 snap-shot from Wynn, which did not have a score (at this point in the year, snap shots were not given a grade).

111.    On or about January 3, 2013, O'Mahoney gave Black an unsatisfactory rating from an alleged formal observation O'Mahoney claimed took place on December 3, 2012 during Black's fourth period class.  However, Black was not observed on December 3, 2012, and did not have a fourth period class in the 2012-2013 school year.  Rather, it appeared that O'Mahoney used information from the November 30, 2012 snap-shot to fabricate this false observation report of a December 3, 2012 lesson.  Neither of the snap-shot observations for which Black received a satisfactory score were "converted" into formal observation reports. Younger co-workers, and

those who did not take an FMLA leave, did not have false observation reports created about them.

112.    The idea that the principal of Sheepshead Bay would fabricate an unsatisfactory observation report in an attempt to satisfy his plan to rid of older teachers startled Black. Black, who had no psychological symptoms that affected his teaching or ability to work prior to O'Mahoney becoming principal, began to suffer from severe anxiety and panic attacks.

113.    The anxiety and panic attacks stemming from Defendants' conduct, including the fabrication of the unsatisfactory observation report, became severe. In or around March 4, 2013, Black called in sick to the DOE's absence registry voicemail, wherein Black indicated that he was battling an illness and that he hoped to be back the following week.  On or about March 10, 2013, Black advised Defendants that he was still ill and would need another week for recuperation. On or about March 17, 2013, Black again advised Defendants that he was still ill and he would need the week to recuperate.  Black utilized his accrued sick days while he was out in March 2013 to recover from his severe anxiety and depression caused by the constant harassment and intimidation Black was subjected to at work.

114.    In or around mid-March 2013, Wynn left a voicemail with Black, and Black returned the call leaving a voicemail stating that he was under a great deal of strain and stress. Black sought mental health treatment because of the conduct of Defendants. Wynn never asked Black to provide any medical documentation regarding his anxiety and emotional condition.

115.    Shortly thereafter, on or about March 20, 2013, Black received correspondence from O'Mahoney that stated Black must either provide O'Mahoney with medical documentation, return to work immediately, or resign as a teacher with the DOE.

116.   In response to O'Mahoney's letter, the psychiatrist who just began treating Black because of Defendants' conduct, Dr. Valeriy Chernov, MD ("Chernov"), provided Defendants with documentation that, due to Black's emotional condition, he was unable to perform his work related activities at that time.

117.   In addition to requesting medical documentation for his absences, O'Mahoney's letter, dated March 20, 2013, also demanded Black fill out an OP 160 form requesting a Restoration of Health, which Black completed and emailed to O'Mahoney's office.

118.   On or about April 3, 2013, Dr. Chernov sent another letter to Defendants, advising that Black was still suffering from emotional difficulties, and would not be able to return to work until April 29, 2013. Black's emotional difficulties included severe anxiety and depression.

119.   On April 29, 2013, Black resumed teaching at Sheepshead Bay.  Upon returning to work, Black sent Defendants correspondence that he was withdrawing his request for Restoration of Health leave because he had returned to work.

120.   After Black returned to work from his medical leave, O'Mahoney consistently harassed Black and disciplined or attempted to discipline Black for falsified and baseless reasons due to his age and in retaliation for taking an FMLA leave.

121.   For example, teachers were assigned to meet with in groups to discuss their respective students, and the groups are supposed to be formed so that the teachers in the group have many of the same students.  O'Mahoney switched Black to an academy meeting causing him to have four consecutive periods with either a class or meeting, and placing him in a group that had no relation to the classes or students Black actually taught.  Black informed O'Mahoney of these issues relating to O'Mahoney switching his academy group, and O'Mahoney yelled

back, "No! Stay in the academy I assigned to you. You are a grown man, you shouldn't be here if you can't do your job!"

122.    O'Mahoney also unjustifiably criticized Black's job performance, despite the fact that Black's colleagues and students' parents observed him to be an exceptional teacher.

123.    On or about May 13, 2013, O'Mahoney entered Black's classroom with an assistant principal to observe Black's class. O'Mahoney conducted this observation of Black even though he had just given Black two new classes with new students only two days earlier. Although Black conducted this lesson to students he had only known for two days, O'Mahoney told Black that he liked Black's lesson.  However, O'Mahoney did not write or issue an observation report for this observation.

124.    On or about May 16, 2013, Black attended a meeting with assistant principal Ford and Ford discussed Black's absences.  Black explained that all his absences were approved by the DOE.  Ford accused Black of a pattern of taking off every spring, claiming that Black's Family Medical Leave for his mother's illness and short leave for his anxiety condition hurt Regents students.  Ford warned Black that he could give him a disciplinary letter for these absences, stating, "Right or wrong, you're not here."  Ford gave Black this warning even though it was Defendants' conduct which caused Black to suffer the emotional distress that caused him to take that leave.  Black also pointed out that he took FMLA leave because his mother was ill and that his medical leave was well documented by his doctor.

125.    In or around May 2013, upon information and belief, O'Mahoney told another employee, Ms. Komarovsky, at Sheepshead Bay, that Black knows how to beat the system and he would get Black the following year.

126.    The following school year, in or around October 2013, Izzo conducted an informal observation of Black's class, giving him ineffective ratings in several categories and an overall rating of borderline developing. The ineffective ratings were baseless.  For instance, Izzo gave Black an ineffective in the category of "using questioning and discussion techniques," stating that Black did not include high order thinking questions in his lesson.  However, Black used a whole range of questions in his lesson, including high order thinking questions, and the questions he used were included in his lesson plan. When Black received the observation report from Izzo, which had Black's lesson plan attached, the page from his lesson plan with the high order thinking questions had been removed.

127.    In or around December 2013, Izzo conducted another informal observation of Black's class, again giving him one developing and one ineffective.  Similar to the October 2013 observation report, the developing and ineffective rating were baseless.

128.    In or around December 2013, Izzo went out on maternity leave.  Prior to leaving for maternity leave, Izzo completed formal observations of Black's younger colleagues but did not complete a formal observation of older teachers including Black. Black heard Izzo state, "I take care of my own."

129.    In or around March 2014, Clark, the temporary math coach, conducted a coaching session of Black's classroom.  Clark suggested to Black that he stop relying on the blackboard as much and to try incorporating the use of the projector in his lessons.  Black's classroom did not have a screen for the projector, and when available, he had to use chart paper as a screen.  Black advised Clark that he did not have any chart paper to use for his screen.  Clark told Black that she would order more chart paper as she was in charge of ordering supplies for the Math Department.

130.    On or about March 2014, Black was observed by Leslie Paoletti ("Paoletti") of Pearson, a private consultant and math coach hired by the school. Sheepshead Bay hired Pearson to conduct reviews and training of its teachers to help them implement a new teaching method. The reviews and training were supposed to be confidential—between the teacher and the consultant. After Black performed the lesson, Paoletti complimented him and said it would not be necessary for her to observe him again. Paoletti showed Black the review she was going to send to her company, and it was highly complementary of Black. He later received an email from Paoletti stating that he did very well, and that she was pleased with his teaching and the student response.

131.    On or about March 19, 2014, O'Mahoney conducted an informal observation during Black's first period class. O'Mahoney gave Black ten ineffective ratings. A review of the observation report shows that O'Mahoney's ratings were baseless. He gave Black ten ineffective ratings, without one positive thing to say. The "over-the-top" qualities of this observation report demonstrate O'Mahoney's bias. As further evidence of O'Mahoney's bias, he gave Black a negative evaluation with respect to the physical appearance of his classroom which Black shared with a younger teacher, Mr. Vidal. Thereafter, despite the fact that there was no change in the physical appearance of the classroom, the administration gave Mr. Vidal a positive rating for the same classroom's appearance. Also, although this was a team teaching class with Mr. Vidal, O'Mahoney chose to observe only Black.

132.    On or about March 21, 2014, Black attended a post observation conference with O'Mahoney for the March 19, 2014 observation. O'Mahoney berated Black for not using a computer, even though his classroom did not have a projector screen, and for not having chart paper, even though Black had already requested chart paper from Clark. O'Mahoney alleged that

Black's students did not respect Black, and that one student, "M", had an outburst during Black's lesson, all of which were false. O'Mahoney also refused to allow Black to defend himself against the false and baseless allegations at the post observation conference. Black repeatedly asked to respond, but O'Mahoney did not allow him to do so. He felt intimidated and bullied, as O'Mahoney subjected him to psychological degradation. O'Mahoney allowed Black's younger colleagues and those who did not take FMLA leave to defend themselves and rebut allegations that were made during post observation conferences and did not make false or baseless allegations against them.

133.    On or about March 25, 2014, at a Math Department meeting, O'Mahoney attempted to hand Black his observation report in front of all the other teachers. Black refused the report because O'Mahoney was attempting to humiliate him. O'Mahoney raised his voice to Black and demanded Black come to O'Mahoney's office and pick up the report. Similarly situated younger teachers and those teachers who did not take FMLA leave were not humiliated or given observation reports in a public setting.

134.    Later that same day, O'Mahoney sent Black an email stating, "Please be reminded to sign the observation report and return it to Ms. Dellis by Thursday, March 27 at 3 pm. You will receive a copy and a copy will be placed in your file." Black felt bullied and insulted. Similarly situated younger teachers and those that did not take FMLA leave did not receive email reminders to sign their observation report.

135.    On March 27, 2014, Paoletti mistakenly sent Black an e-mail intended for O'Mahoney. The e-mail revealed that O'Mahoney was pressuring Paoletti to change her positive report of Black. The consultant's opinion and advice were supposed to be confidential as between her and Black, and her communication with O'Mahoney not only violated

confidentiality, but was a product of corruption, as O'Mahoney influenced Paoletti's report even though he was not present when Paoletti conducted the review and training. Paoletti begged Black not to tell O'Mahoney about her e-mail mistake. After Paoletti's communications with O'Mahoney, she downplayed Black's progress, and reneged on her representation that Black would not have to be observed by her anymore, and instead began contacting Black for additional observations.

136.   O'Mahoney's baseless negative ratings and collusion with Paoletti, coupled with O'Mahoney's overall harassment of Black and the older teachers, aggravated Black's anxiety. O'Mahoney's plan to mentally and emotionally break the senior teachers was taking its toll on Black. On April 1, 2014, Dr. Chernov sent a letter to Defendants advising that due to Black's anxiety, Black would need a leave from work from April 1, 2014 through April 2, 2014. At this point, the prolonged and egregious harassment and discrimination of Black by Defendants resulted in Post Traumatic Stress Disorder.

137.   On April 28, 2014, Dr. Chernov sent another letter to Defendants advising that Black's anxiety and depression had worsened and that he would require at least three (3) days of rest. Thereafter on May 1, 2014, Black's treating psychologist, Dr. Jane E. Gartner, PhD ("Gartner") sent correspondence to Defendants regarding Black's treatment for anxiety and depression due to the increased stress and tension at work.

138.   On or about May 12, 2014, Izzo conducted a pre-observation conference with Black. Izzo approved Black's plan for the lesson. However, shortly thereafter, Izzo informed Black that the pre-observation conference would have to be redone, as Izzo required that Black use a completely new teaching structure and format. It was highly unusual for a principal or assistant principal to schedule a second pre-observation conference and drastically change the

format of the lesson. Black expressed to Izzo that he thought this was unfair that he only had one day to prepare this lesson using a completely new structure and format, and Izzo said that Black could do the lesson as previously discussed, but that his rating will suffer.

139.     Understanding that Izzo was attempting to set Black up to fail, he decided to conduct the lesson as Izzo later instructed, using this brand new format and structure, and Black performed an excellent lesson.   However, Izzo observed the lesson and gave Black four ineffective ratings and 12 developing rating, which all had no basis in fact and could not be supported.

140.     For example, Izzo arrived ten minutes late and missed the "Do Now" and a portion of the mini-lesson, yet criticized Black for omitting certain items from his lesson, such as the use of technology, which she was not there to observe because she was late.   At the post-conference meeting, Izzo cited him for not using certain online materials, but those online materials to which she referred were not made available to the teachers until after the observation.   Also, the lesson plan attached to the observation report omitted the "Do Now" and mini-lesson pages that were part of the plan.

141.     Upon O'Mahoney becoming Principal at Sheepshead Bay, it was common knowledge amongst the staff that O'Mahoney held older teachers in disdain and preferred younger teachers on his staff.   Numerous staff members, including Black, were subjected to looks of disdain and disgust from O'Mahoney, who did not show this contempt to similarly situated younger teachers and staff.

142.     Since O'Mahoney became Principal, O'Mahoney and Izzo advised younger teachers of when an informal observation would be conducted.   For example, in or around late March 2014, a young special education teacher, Ms. Velarde, who shares a classroom with

34

Black, asked him if he could try and leave a little early the following day because she was going to get an informal observation from O'Mahoney. O'Mahoney had told Ms. Velarde in advance that he was coming to observe her. Informal observations are supposed to be unannounced visits. Older teachers, including Black, were not advised by O'Mahoney or Izzo of when the informal observations would be conducted.

143.   Additionally, O'Mahoney gave preferential treatment to younger teachers. Older teachers, including Black, were repeatedly observed during their first period classes, when children were often still arriving late, whereas, the younger teachers were allowed to reschedule observations because of low attendance. Also, younger teachers have been allowed to reschedule an informal observation when they did not have lesson plans prepared on the day of the informal observation. Older teachers received unsatisfactory ratings when they did not have a prepared lesson plan during an informal observation.

144.   Moreover, throughout O'Mahoney's tenure as principal at Sheepshead Bay, O'Mahoney subjected older teachers to unfounded discipline, like Susan Crichlow, Barry Martin, Herman Lebowitz, Elina Lozovskaya, Nataliya Shafrina, Jean Laventure, Florence Egbuchulam, Robert Fasano, Joseph Klass, and Kathleen Morgenlander, and generally harassed older teachers into retirement, like Steve Cohen, while consistently replacing them with younger teachers.

145.   Because the discrimination and harassment of Defendants caused Black extreme emotional distress, he made several requests to be transferred out of Sheepshead Bay. However, those requests were not granted.

146.   In or around June 2014, Black was "excessed" out of Sheepshead Bay and no longer working there. He was waiting to be assigned to a new school or the ATR pool. On or about August 26, 2014, Black was told that he had to return to Sheepshead Bay to teach. Black's

psychiatrist and psychologist believed Black was able to be a productive teacher, but strongly advised against returning to Sheepshead Bay, the site that was causing him the emotional distress and trauma.  At this point, Black's Post Traumatic Stress Disorder was exacerbated.  Black asked again to be assigned to a different school, but that request was rejected and Black had no choice but to return to Sheepshead Bay against the advice of his psychiatrist and psychologist.

147.    When Black arrived back to school, O'Mahoney did not have a program established for him. This left Black teaching no classes for three and a half weeks during the beginning of the 2014-2015 school year, and the school provided him with no guidance as to whether he would even remain at Sheepshead Bay.  Then, out of nowhere, in the fourth week of the new school year, O'Mahoney assigned Black four different math classes that required Black to conduct four individual preps.  The assignment violated the collective bargaining agreement, and Black filed and won his grievance.  O'Mahoney was then forced to assign Black a proper schedule, but to punish him, took away Black's cafeteria duty, replacing it with another math class.

148.    Black was advised that every Monday a new person from Pearson would be observing him.  Black was uneasy about having the consultant observe him every Monday given that Black caught the previous consultant colluding with O'Mahoney.

149.    In or around October 24, 2014, Izzo observed Black and at the post-observation conference showed Black his scores, none of which were ineffective.  However, Izzo told Black that the scores were going to be reviewed by O'Mahoney. When Black received the official observation report, one of the scores was changed to ineffective.  The score that was changed to ineffective involved a point for which Izzo was not even present to observe, and made no mention of during the post-observation conference.

150.     Black remained at Sheepshead Bay during the first half of the 2014-2015 school year and did his best to endure the hostile work environment for the semester.  Black was forced to take nine (9) days off during the semester due to panic attacks, anxiety, and post traumatic stress disorder ("PTSD"), which was caused by Defendants' conduct.

151.     In or around February 2015, as a result of the discrimination and harassment endured by Black at the hand of Defendants, Black admitted himself to Paine Whitney Emergency Room for exacerbation of his PTSD.  As a result, on or about February 23, 2015, Black went on extended leave.

152.     In or around April 2015, Black was sent by the school to Dr. Anne Garner, a DOE psychiatrist, to assess his condition and make a determination about Black's capacity to perform his job.  Strangely, the letter directing that Black be evaluated by Dr. Garner stated that the reason was because Black had a pattern of absences, and listed FMLA leave for his sick mother and his educational sabbatical in 2011.  Dr. Garner told Black that his sabbatical and FMLA leave were irrelevant to the evaluation.

153.     Initially, Garner found Black fit to return to work, but learned that Black was going to have to return to Sheepshead Bay, the place that caused him severe anxiety and the diagnosis of Post Traumatic Stress Disorder.   Understanding that Black would have to return to the hostile environment at Sheepshead Bay, Garner changed her report and declared Black unfit to return to work, but failed to fully acknowledge that the only reason she declared Black unfit was because he was going to have to return to Sheepshead Bay where he was enduring a discriminatory, retaliatory and hostile work environment.

154.     O'Mahoney even found a way to harass Black while he was out on leave.  Upon information and belief, O'Mahoney alleged, without any supporting evidence, that Black was

fabricating his mental and emotional condition, and was actually working as an accountant or in the film industry during his leaves.

155.    On or around May 4, 2015, investigators from the Special Commissioner of Investigators Office went to Black's house looking for him.   The investigators spoke with Black's mother and they told her that they were looking for Black, refusing to tell her what the visit was for.  Black contacted the union, who provided him with a criminal attorney.  It was only after he was assigned the criminal attorney that Black learned that they were investigating whether Black was faking his illness and worked in the accounting and film industry during his leave.  The claim was frivolous, and the investigation was dropped two months later.

156.    On or about June 13, 2015, the DOE informed Black that he was going to be placed in excess from Sheepshead Bay for the 2015-2016 school year.

157.    From the foregoing, Black alleges that Defendants discriminated against him based on his age, and retaliated against him, in violation of the Age Discrimination in Employment Act, The Family Medical Leave Act, and the New York State and City Human Rights Laws, and  suffered emotional, physical, and financial damages.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE ADEA AGAINST THE DOE

158.    Plaintiffs Lebowitz, Reznikov, and Black, repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint.

159.    The Age Discrimination in Employment Act of 1967 provides in pertinent part that:

    a.      It shall be unlawful for an employer (1) … to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of

employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

160.    Plaintiffs Lebowitz, Reznikov and Black, while employed by the DOE, were over the age of 40.

161.    As described above, the DOE took adverse employment actions against Lebowitz, Reznikov and Black because of their age by, among other things, subjecting them to a hostile work environment, deliberately mischaracterizing their teaching performance to get them discharged, or force them to retire, making offensive comments about their age and older teachers, and treating them in an unfair, discriminatory and hostile manner, and treating them in a disparate fashion as compared to the younger teachers, in violation of the Age Discrimination in Employment Act of 1967.

162.    Lebowitz, Reznikov and Black repeatedly complained about the hostile work environment, but Defendants only intensified the harassment and intimidation.

163.    The DOE's violation of the ADEA resulted in Lebowitz, Reznikov and Black suffering financial and monetary losses, extreme emotional distress, and physical illnesses and manifestations as a result of the emotional distress.

## AS A SECOND CAUSE OF ACTION
### FOR RETALIATION UNDER THE ADEA AS AGAINST THE DOE

164.    Plaintiffs Lebowitz, Reznikov, and Black repeat, reiterate, and reallege each and every allegation in the above paragraphs of this complaint.

165.    The Age Discrimination in Employment Act provides in pertinent part that

    a.    It shall be unlawful for an employer to discriminate against any of his employees …because such individual… has opposed any practice made unlawful by this section, or because such individual… has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

166.    Lebowitz, Reznikov and Black repeatedly complained to Defendants about the discriminatory treatment endured by them because of their age.  Defendants did not correct the hostile work environment, but instead intensified the harassment and discrimination.

167.    The union filed a grievance against the DOE for forcing teachers to reapply for their positions and then not re-hiring many of the older teachers.

168.    As a result of Lebowitz, Reznikov and Black opposing the discriminatory practices prohibited by the ADEA, Defendants retaliated against them by subjecting them to a hostile work environment, deliberately mischaracterizing their teaching performance to get them discharged, or force them to retire, making offensive comments about their age and older teachers, and treating them in an unfair, discriminatory and hostile manner.

169.    Defendants' actions in retaliating against Lebowitz, Reznikov and Black resulted in financial losses, extreme emotional distress, and physical illnesses and manifestations as a result of the extreme emotional distress.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE ADA AS AGAINST THE DOE

170.    Plaintiff Reznikov, repeats, reiterates, and realleges each and every allegation in the above paragraphs of this complaint.

171.    The Americans with Disabilities Act prohibits discrimination against individuals who have disabilities or are regarded as having disabilities, as long as such individual can perform the essential function of his or her job.

172.    Reznikov was regarded as having a disability—cancer—when she was seeking medical treatment and undergoing procedures to determine if she had cancer.

173.    Reznikov was able to perform the essential functions of her job, and at most, needed the reasonable accommodation of being excused when she had doctor's appointments to undergo the necessary tests and medical treatment.

174.    Because Reznikov was regarded as having a disability, Defendants discriminated against her by, among other things, creating a hostile work environment, making offensive and egregious comments about her having cancer and dying, engaging in other harassment, deliberately mischaracterizing her performance in an attempt to get her discharged or to force her to retire, failing to accommodate Reznikov's requests for necessary sick leave for cancer testing, and refusing to allow her to take breaks which negatively impacted her ability to undergo certain medical procedures, in violation of the Americans with Disabilities Act.

175.    The discrimination resulted in Reznikov suffering financial losses, extreme emotional distress, and physical illnesses and manifestations resulting from the extreme emotional distress.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII AS AGAINST THE DOE

176.    Plaintiff Reznikov, repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

177.    Title VII of the Civil Rights Act of 1964 provides, in pertinent part, that

It shall be an unlawful employment practice for an employer – (1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ...national origin, or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ...national origin.

178.    Reznikov is of Russian decent, was born in Russia and has a Russian accent.

179.     As described above, the DOE has taken adverse employment actions against Reznikov because of her national origin by, among other things, subjecting her to a hostile work environment, making offensive and derogatory comments about her accent, mischaracterizing her work performance because of her national origin and accent, and attempting to force her to retire or leave the school because of her national origin and accent, in violation of Title VII of the Civil Rights Act of 1964.

180.     As a result of Defendants' discrimination, Reznikov suffered financial losses, extreme emotional distress and physical illnesses and manifestations as a result of the extreme emotional distress.

## AS A FIFTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE FMLA AS AGAINST THE DOE

181.     Plaintiff Black repeats, reiterates and realleges each and every allegation made in the above paragraphs of this complaint.

182.     FMLA § 2615(a)(2) provides that it is unlawful for any employer to discriminate against any individual for exercising rights under the FMLA.

183.     Black exercised his rights under the FMLA when he took a leave to care for his mother in 2012.

184.     Upon returning from the FMLA leave, the DOE took adverse employment actions against Black because he exercised his rights under the FMLA by, among other things, manufacturing negative observation reports, subjecting him to a hostile work environment wherein he was harshly criticized for his absences, and mischaracterizing Black's performance.

185.     As a result of that conduct, Black suffered financial losses, extreme emotional distress and physical illnesses and manifestations as a result of the extreme emotional distress.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE AS AGAINST THE DOE, O'MAHONEY AND IZZO

186.     Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

187.     The Administrative Code of City of NY § 8-107 [1] provides that

a.      It shall be an unlawful discriminatory practice: (1) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

188.     Lebowitz, Reznikov and Black were all over 40 year old during their employment in the subject period described above.

189.     Reznikov was regarded as disabled by Defendants as a result of the treatment and tests she received to determine if she had cancer.  She was able to perform the essential functions of her job, and at most, needed only a reasonable accommodation of being excused to obtain the medical treatment and tests.

190.     Reznikov is Russian, was born in Russia and has a Russian accent.

191.     As described above, Defendants took adverse employment actions against Plaintiffs because of their ages, and against Reznikov also because of her perceived disability and national origin by, among other things, subjecting them to a hostile work environment, making comments regarding Lebowitz's age, Reznikov's age, disability, and national origin, and Black's age, deliberately mischaracterizing their performance and fabricating baseless observation reports to force them to retire or to get them discharged, and treating them in a disparate fashion as compared to the younger teachers,   in violation of New York City Administrative Code Title 8.

192.    As a result of the discrimination, Lebowitz, Reznikov and Black suffered financial losses, extreme emotional distress, and physical illnesses and manifestations as a result of the extreme emotional distress.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE AS AGAINST THE DOE

193.    Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

194.    The New York City Administrative Code Title 8, §8-107(1)(e) provides that it shall be an unlawful discriminatory practice: "For an employer to discriminate against any person because such person has opposed any practices forbidden under this chapter . . ."

195.    Lebowitz, Reznikov and Black all complained to Defendants about their discriminatory treatment.

196.    The union filed a grievance against the DOE for forcing teachers to reapply for their positions and then not re-hiring many of the older teachers.

197.    Because Lebowitz, Reznikov and Black complained about the discrimination and opposed Defendants' discriminatory conduct, Defendants retaliated against them by, among other things, creating a hostile work environment, making offensive comments, deliberately mischaracterizing their work performance and fabricating baseless observation reports to force them to retire or to get them discharged, and treating them in a disparate fashion as compared to those who did not complain about the discrimination.

198.    Defendants' conduct violated New York City Administrative Code Title 8.

199.    As a result of the retaliation, Lebowitz, Reznikov and Black suffered financial losses, extreme emotional distress and physical illnesses and manifestations as a result of the extreme emotional distress.

## AS AN EIGHTH CAUSE OF ACTION AGAINST
## THE INDIVIDUAL DEFENDANTS O'MAHONEY AND IZZO FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

200.     Plaintiffs Lebowitz, Reznikov, and Black repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

201.     Under New York City Administrative Code Title 8-107(6), "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

202.     As detailed above, O'Mahoney and Izzo aided and abetted the DOE's discrimination, retaliation and harassment alleged above by participating in the discrimination and retaliating, and creating the hostile work environment to which Plaintiffs were subjected, in violation of the New York City Administrative Code Title 8-107.

203.     As a result of the discrimination, retaliation and harassment, in which O'Mahoney and Izzo participated, Lebowitz, Reznikov and Black suffered financial losses, extreme emotional distress, and physical illnesses and manifestations as a result of the extreme emotional distress.

## AS A NINTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK STATE HUMAN RIGHTS LAW AS AGAINST THE DOE

204.     Plaintiffs Lebowitz, Reznikov, and Black repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint.

205.     New York State Human Rights Law provides that

a.     It shall be an unlawful discriminatory practice: (1) For an employer or licensing agency, because of an individual's age, … national origin,… [or] disability… to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

206.    Lebowitz, Reznikov and Black were all over 40 year old during their employment in the subject period described above.

207.    Reznikov was regarded as disabled by Defendants as a result of the treatment and tests she received to determine if she had cancer.  She was able to perform the essential functions of her job with an accommodation of being excused to obtain the medical treatment and tests needed.

208.    Reznikov is Russian, was born in Russia and has a Russian accent.

209.    As described above, Defendants took adverse employment actions against Plaintiffs because of their ages, and against Reznikov because of her perceived disability and national origin by, among other things, including subjecting them to a hostile work environment, making comments regarding Lebowitz's age, Reznikov's age, disability, and national origin, and Black's age, deliberately mischaracterizing their performance and fabricating baseless observation reports to force them to retire or to get them discharged, and treating them disparately as compared to the younger teachers, in violation of New York State Human Rights Law.

210.    As a result of the discrimination, Lebowitz, Reznikov and Black suffered financial losses, extreme emotional distress, and physical illnesses and manifestations as a result of the extreme emotional distress.

### AS A TENTH  CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK STATE HUMAN RIGHTS LAW AS AGAINST THE DOE

211.    Plaintiffs' Lebowitz, Reznikov, and Black repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint.

212.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to

retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

213.   Lebowitz, Reznikov and Black all complained to Defendants about their discriminatory treatment.

214.   The union filed a grievance against the DOE for forcing teachers to reapply for their positions and then not re-hiring many of the older teachers.

215.   Because Lebowitz, Reznikov and Black complained about the discrimination and opposed Defendants' discriminatory conduct, Defendants retaliated against them by, among other things, creating a hostile work environment, making offensive comments, deliberately mischaracterizing their work performance and fabricating baseless observation reports to force them to retire or to get them discharged, and treating them in a disparate fashion as compared to those who did not complain about the discrimination.

216.   Defendants' conduct violated New York State Human Rights Law.

217.   As a result of the retaliation, Lebowitz, Reznikov and Black suffered financial losses, extreme emotional distress and physical illnesses and manifestations as a result of the extreme emotional distress

### AS AN ELEVENTH CAUSE OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS O'MAHONEY AND IZZO FOR DISCRIMINATION UNDER STATE LAW

218.   Plaintiffs Lebowitz, Reznikov, and Black repeat, reiterate and reallege each and every allegation made in the above paragraphs of this complaint.

219.   New York State Executive Law §296(6) provides that it "shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

220.    As detailed above, O'Mahoney and Izzo aided and abetted the DOE's discrimination, retaliation and harassment alleged above by participating in the discrimination and retaliation, and creating the hostile work environment to which Plaintiffs were subjected, in violation of the New York State Human Rights Law.

221.    As a result of the above conduct, Lebowitz, Reznikov and Black suffered financial losses, extreme emotional distress, and physical illnesses and manifestations as a result of the extreme emotional distress.

## AS A TWELFTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS AGAINST THE DOE, O'MAHONEY AND IZZO

222.    Plaintiffs Lebowitz, Reznikov, and Black repeat, reiterate and reallege each and every allegation made in the above paragraphs of this complaint.

223.    The DOE, O'Mahoney and Izzo deliberately and purposefully harassed and discriminated against Lebowitz, Reznikov and Black because of their age.

224.    The DOE, O'Mahoney and Izzo deliberately and purposefully harassed and discriminated against Reznikov because of her perceived disability and national origin.

225.    The DOE, O'Mahoney and Izzo purposely attempted to upset, humiliate and embarrass Lebowitz, Reznikov and Black to force them to retire and end their careers as teachers.

226.    For malicious and illegal reasons, the DOE, O'Mahoney and Izzo attempted to end the teaching careers of Lebowitz, Reznikov and Black.

227.    As described above, the conduct of the DOE, O'Mahoney and Izzo was outrageous and must not be tolerated in a civilized society.

228.    As a result of that conduct, Lebowitz, Reznikov and Black suffered extreme emotional distress and physical illnesses and manifestations as a result of that emotional distress.

WHEREFORE, Plaintiffs demand judgment against Defendants for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiffs are entitled.  Plaintiffs demand a trial by jury.

Dated:   Garden City, New York
   March 31, 2016

           Stagg, Terenzi, Confusione & Wabnik, LLP


          By: /s/David R. Ehrlich
           Debra L. Wabnik (dw-0944)
           David R. Ehrlich (de-9786)
          *Attorneys for Plaintiffs*
          401 Franklin Avenue, Suite 300
          Garden City, New York 11530
          (516) 812-4500

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X   Docket No.:  1:15-cv-02890-LDH-ST
HERMAN LEBOWITZ, EKATERINA
REZNIKOV, and KEITH BLACK,                              **CERTICATE OF SERVICE**

                    Plaintiffs,         **Hall, J.**
                                                        **Tiscione, M.**

     -against-

THE NEW YORK CITY DEPARTMENT
OF EDUCATION, JOHN O'MAHONEY,
and LAURA IZZO,
(individually and in their official capacities),

                    Defendants.
-----------------------------------------------------X

      I hereby certify that on March 31, 2016, the **THIRD AMENDED COMPLAINT** of

Plaintiffs Herman Lebowitz, Ekaterina Reznikov and Keith Black was served in accordance with the

Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern

District's Rules on Electronic Service upon the following parties and participants:

TO:    Alexis Downs, Esq.
       New York City Law Department
       Labor and Employment Division
       *Attorneys for Defendants*
       *The New York City Department*
       *of Education, John O'Mahoney*
       *and Laura Izzo*
       100 Church Street
       New York, New York 10007
       (212) 356-2507

                              /s/David R. Ehrlich
                              David R. Ehrlich (de-9786)
                              Stagg, Terenzi, Confusione & Wabnik, LLP
                              401 Franklin Avenue, Suite 300
                              Garden City, New York 11530
                              (516) 812-4500